UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JESENIA REYES,

                Plaintiff,

-against-

CITY PRACTICE GROUP OF NEW YORK,
LLC, SUMMIT HEALTH MANAGEMENT,
LCC,

                Defendants.

22-CV-09482 (LAP)

MEMORANDUM & ORDER

---

LORETTA A. PRESKA, Senior United States District Judge:[1]

       Plaintiff Jesenia Reyes ("Plaintiff") brings this action against defendants City Practice Group of New York, LLC ("CityMD"), and Summit Health Management, LLC ("Summit") (collectively "Defendants" or the "Company"). (See Compl. dated November 4, 2022 [dkt. no. 1].) Plaintiff brings this action against Defendants pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290, et seq. ("NYSHRL") and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL") to recover damages she allegedly sustained as a result of being discriminated against and retaliated against on the basis of her pregnancy. (Id. ¶ 1.) Plaintiff alleges that Defendants discriminated against her by denying her requests for a reasonable

---

[1] All page citations refer to the ECF page number as opposed to the party's original page number.

accommodation, passing her over for promotion, treating her less favorably than similarly situated male/non-pregnant female employees, and terminating her, at least in part, due to her pregnancy (First, Third, Fifth Causes of Action). (Id. ¶¶ 92-115.) Plaintiff also alleges that following her requests for a reasonable accommodation and complaint about Defendants' discriminatory practices, she was retaliated against by Defendants (Second, Fourth and Sixth Causes of Action). (Id. ¶¶ 98-119.)

Before the Court is Plaintiff's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[2] Defendants oppose the motion and move for summary judgment on all

---

[2] (See Pl. Mot. for Summ. J., dated Apr. 5, 2024 [dkt. no. 47]; Pl. Rule 56.1 Statement ("Pl. 56.1"), dated Apr. 5, 2024 [dkt. no. 47-2]; Aff. of Jesenia Reyes ("Pl. Aff."), dated Apr. 2, 2024 [dkt. no. 47-3]; Pl. Mem. of Law in Supp. of Mot. for Summ. J. ("Pl. Br."), dated Apr. 5, 2024 [dkt. no. 47-4].)

claims.[3]  Plaintiff opposes Defendants' motion.[4]  For the reasons set forth below, Plaintiff's motion for summary judgment is DENIED, and Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

## I.   **Background**

CityMD is the largest urgent care provider in New York and New Jersey.  (Compl. ¶¶ 12, 50.)  Plaintiff was employed by CityMD from January 6, 2020, to December 27, 2020.  (Def. Resp. to Pl. 56.1 ¶ 1.)  Following the merger between CityMD and Summit, Plaintiff was employed by Summit from December 27, 2020, until she was terminated on July 5, 2022.  (Id.; Pl. Aff. at 1.)

Plaintiff was employed as a Patient Service Representative ("PSR") at an urgent clinic, located at 14 West 14th Street, New

---

[3] (See Def. Mot. for Summ. J., dated May 6, 2024 [dkt. no. 48]; Def. Mem. of Law in Supp. of Mot. for Summ. J. and Mem. of Law in Opp'n to Pl. Mot. for Summ. J. ("Def. Br."), dated May 6, 2024 [dkt. no. 49]; Decl. of Gerald Mariscal in Supp. of Mot. for Summ. J. ("Mariscal Decl."), dated May 2, 2024 [dkt. no. 50-1]; Decl. of Maham Chaudhry in Supp. of Mot. for Summ. J. ("Chaudhry Decl."), dated May 2, 2024 [dkt. no. 50-2]; Decl. of Meghan Salazar in Supp. of Mot. for Summ. J. ("Salazar Decl."), dated May 6, 2024 [dkt. no. 51]; Def. Response to Pl. 56.1 and Def. Rule 56.1 Statement ("Def. Resp. to Pl. 56.1 and Def. 56.1"), dated May 6, 2024 [dkt. no. 52]; Def. Reply Mem. of Law in Supp. of Summ. J. ("Def. Reply"), dated June 27, 2024 [dkt. no. 54]; Reply Decl. of Gerald Mariscal in Supp. of Mot. for Summ. J. ("Mariscal Reply Decl."), dated June 24, 2024 [dkt. no. 55]; Def. Reply to Pl. Response of Def. 56.1 ("Def. Reply to Pl. Resp. of Def. 56.1"), dated June 27, 2024 [dkt. no. 56].)

[4] (See Pl. Reply Mem. of Law in Supp. of Mot. for Summ. J. and in Opp'n to Def. Mot. for Summ. J. ("Pl. Reply Br."), dated June 6, 2024 [dkt. no. 53]; Pl. Response to Def. 56.1 ("Pl. Resp. to Def. 56.1"), dated June 6, 2024 [dkt. no. 53-1].)

York, New York 10011.  (Def. Resp. to Pl. 56.1 ¶¶ 2-3.)  Plaintiff
picked up additional shifts at a clinic located at 331 6th Avenue,
New York, New York 10014.  (Id. ¶ 4.)  Plaintiff's duties included
greeting and directing visitors, maintaining an efficient patient
flow through the registration process, promptly answering and
directing phone calls, informing patients of delay in schedules,
posting all self-pay charges, collecting payments and providing
patients with receipts, reconciling daily payments, and so on.
(Id. ¶ 5.)  Starting in March 2022, Plaintiff directly reported to
Maham Chaudhry, Assistant Site Manager.  (Id. ¶ 6.)  Chaudhry
reported to Gerald Mariscal, Site Manager.  (Mariscal Decl. at 2.)
For a period of time, Plaintiff reported directly to Mariscal.
(Def. Resp. to Pl. 56.1 ¶ 6.)

**A. Plaintiff's Performance and Potential Promotion**

Based on Plaintiff's 2020 and 2021 Performance Reviews,
Plaintiff was consistently rated as "Meets Expectations" and
received positive feedback.  (Dkt. no. 50-3 at 2; dkt. no. 47-31
at 1-3.)

In Plaintiff's 2020 review, under the Dependability section,
Plaintiff's rating was "Needs Improvement," and the manager's
comment reads, "Jesenia has no active accommodation and . . . has
limited and restricted availability."  (Dkt. no. 50-3 at 3.)

In Plaintiff's 2021 review, one of her manager's comments
included, inter alia, that Plaintiff "is expected to demonstrate

4

her leadership capabilities in year 2022." (Dkt. no. 47-31 at 1.) Additionally, under the Goals section it reads, "[i]n 2022 Jesenia has expressed to being open to development to Senior PSR, that is to be expected roughly September 2022."[5] (Id.) The manager comment underneath that section reads, "Jesenia is made aware that her personal schedule currently hinders her growth but expects to see improvement personal [sic] to obtain her goals with the company." (Dkt. no. 47-31 at 3.)

On November 17, 2021, Mariscal met with Plaintiff to discuss her performance and development, and emailed a summary of the meeting to Erick Martinez, Human Resources Business Partner, and Meghan Salazar, Human Resources Manager, among others. (Dkt. no. 47-31 at 4.) According to the contemporaneous summary, Plaintiff asked for feedback on her quality of work and Mariscal's view on her development plan. (Id.) Mariscal provided positive feedback and noted that Plaintiff expressed an interest in growing within the Company to become a Shift Supervisor. (Id.) Mariscal stated, "I genuinely believe that you have the knowledge and skillset to do a great job at the role. However, as I have previously told you, your biggest area of opportunity is can you separate the friendship from the professional." (Id.) Mariscal provided

---

[5] The parties disagree about whether this language means that September was the earliest or latest time Plaintiff would be promoted. (Def. Reply to Pl. Resp. of Def. 56.1 ¶ 10.)

additional context and Plaintiff acknowledged and agreed it was something she needed to improve. (Id.) Mariscal stated "so [we] must . . . see continued improvement on this, before pushing you to the next step. As always, we will continue to have our touch bases with one another so we can gauge your performance as the year goes on and provide any feedback in real-time." (Id.)

With respect to performance and potential promotions, employees would receive coaching on specific areas of improvement, and if an employee expressed interest in obtaining a certain higher-lever role, management might assign the employee tasks normally performed by someone in that higher-level role to see how the employee performs. (Def. Resp. to Pl. 56.1 ¶ 124.) Chaudhry would document that feedback because the manager, district manager, and Human Resources required documentation to recommend a person for promotion. (Def. Resp. to Pl. 56.1 ¶ 153.) With respect to applying for promotions, there is no consensus whether open positions are posted on Defendants' internal platform. In Defendants' Response to Plaintiff's 56.1 Statement, Defendants stated, many times, that promotions to management level positions, which includes Senior PSR and Shift Supervisor, were posted on the Company's internal platform. (Def. Resp. to Pl. 56.1 ¶¶ 137, 139, 140, 143.) Then, in Defendants' 56.1 Statement, Defendants changed their position and stated that Shift Supervisor is a management level position, but Senior PSR is not. (Def. Reply to Pl. Resp.

of Def. 56.1 ¶ 15.)  In addition, Plaintiff claims that Mariscal would tell employees if a position was available.  (Def. Resp. to Pl. 56.1 ¶ 126.)  However, Mariscal testified that he would only tell employees about an available position if he deemed that they were qualified for the promotion.  (Id. ¶¶ 126, 137.)

On March 3, 2022, Mariscal had a brief check-in with Plaintiff to ask her what could be done to make the site better, and emailed a summary of the conversation to Martinez and others.  (Dkt. no. 47-29.)  According to the contemporaneous summary, Plaintiff suggested more organization at the PSR Workstation.  (Id.)  Plaintiff did not volunteer to and did not reorganize the drawers herself.  (Def. Resp. to Pl. 56.1 ¶ 10.; see also dkt. no. 47-29.)

On March 9, 2022, Mariscal wrote a letter of recommendation for Plaintiff to Hunter College and described Plaintiff as "top-performing" and "one of the strongest employees [Mariscal has] worked with."  (Dkt. no. 47-24.)  Mariscal wrote "[i]f her performance at work is any indication of how she would perform at your school, Jesenia would be a positive addition."  (Id.)  Mariscal also wrote, [i]t is my absolute honor to recommend Ms. Reyes as she is one of the best Patient Service Representatives I have encountered at CityMD" and "I recommend her without any reservations."  (Id.)  During Mariscal's deposition on August 31, 2023, he noted that comments in his recommendation letter were not true.  (Dkt. no. 47-12 at 144-48.)  He explained that he wrote

7

what he did because "he wanted her to go to school and actually achieve what she wanted to do." (Id. at 147:4-5.)

On April 18, 2022, Chaudhry and Mariscal met with Plaintiff regarding her Q1 performance, and Mariscal emailed Martinez, CC'ing Lindsey Perez, District Manager, and Chaudhry, a summary of the meeting. (Dkt. no. 50-4 at 2.) According to the contemporaneous summary, when Plaintiff was asked how she would rate her performance, Plaintiff stated "she doesn't warrant an exceeds as she doesn't go above and beyond in her performance." (Id.; but see Def. Reply to Pl. Resp. of Def. 56.1 ¶ 11 (Plaintiff's conflicting testimony about what she said during the meeting).) Mariscal agreed with Plaintiff's self-evaluation and gave Plaintiff several pieces of positive feedback. (Dkt. no. 50-4 at 2.) Chaudhry "thanked Jesenia for all of her hard work as she has been doing a great job." (Id.) When asked if there was anything management could do to further support her, Plaintiff "declined and told us that we have been very flexible with the scheduling." (Id.) Furthermore, Mariscal noted in the summary that "Jesenia is meeting expectations in her role. Her positive interactions with her peers and patients do[] not go unnoticed." (Id.)

On June 10, 2022, Mariscal spoke to Chaudhry to discuss the site's performance and plans to rectify known issues and emailed Martinez, among others, summarizing the meeting. (Dkt. no. 47-15 at 15.) Based on the contemporaneous summary, the site received

8

several negative comments about the front desk. (Id.) In addition, Mariscal said "PSRs Jesenia and Taylor are the lowest performers." (Id.) That day, Mariscal and Chaudhry had conversations with the three PSRs on shift, which included Plaintiff, on the topics of "[p]rofessionalism, [p]hone etiquette, [u]niform and [a]ppearance, [c]ell [p]hone usage, [t]one of [v]oice and [l]ights." (Id.; dkt. no. 47-26 at 5-6.) According to contemporaneous notes that Chaudhry sent to Martinez, among others, during Plaintiff's meetings they noted that they are "having this conversation with all members of the PSR team as we need to improve overall." (Dkt. no. 47-26 at 5.) They also informed Plaintiff that the Company would not open another PSR requisition for West 14th Street because it was "doable." (Def. Resp. to Pl. 56.1 ¶ 74; dkt. no. 47-26 at 6.)

On June 16, 2022, Mariscal met with Chaudhry to finalize the staffing ranks for Q3 as well as discuss site operations and Chaudhry's performance. (Dkt. no. 47-15 at 17.) Mariscal sent a summary of the meeting to Martinez and others. (Id.) According to the contemporaneous summary, Plaintiff was ranked at the very bottom of a list of sixteen employees and under the category labeled "needs improvement." (Id. at 18.) Next to Plaintiff's name was written "[i]mprove on her attitude, willingness to accept change, and receptiveness to feedback." (Id.) Regarding the staff who needed improvement, Chaudhry suggested "that [they]

9

consistently reset expectation[s] with them and hold them accountab[le]" and suggested they "give them small tasks to focus on, and if they don't complete it –- [they] hold them accountable." (Id.) Mariscal "emphasized the importance of creating this list with details of their areas of opportunity and goals as it'll help gauge their performance and see if they're improving in their work." (Id.)

## B. Plaintiff's Pregnancy

On March 30, 2022, Plaintiff disclosed her pregnancy to Mariscal. (Dkt. no. 47-25.) Mariscal relayed the news and a summary of his conversation with Plaintiff to Martinez, Perez, and Chaudhry. (Dkt. no. 47-25.) The summary email stated, inter alia, "I informed Jesenia that I will be connecting her to Employee Relations should she need any resources during this time." (Id.) Mariscal emailed Plaintiff connecting her with "Employee Relations" (er@citymd.net) stating, inter alia, "Due to our previous conversation, I am connecting you with Employee Relations to help further with any accommodations you may need or find helpful." (Dkt. no. 47-18; dkt. no. 47-23 at 1.)

On May 2, 2022, Mariscal forwarded his original email connecting Plaintiff with Employee Relations to Martinez, CC'ing Perez and Chaudhry, stating that Plaintiff "has been trying to reach out regarding her maternity leave and has not heard back. Can we follow up with the leave department on her behalf?" (Dkt.

no. 47-15 at 8-9.)   Martinez added "Summit HR Leave Admin" (HRLeaveAdmin@shm.net) to the email chain.  (Id.)  On May 24, 2022, Mariscal followed up again.  (Id.)  Plaintiff never heard back from Employee Relations.  (Def. Resp. to Pl. 56.1 ¶ 107.)

## C. Plaintiff's Scheduling Requests

Plaintiff's initial job application stated that she had limited availability regarding scheduling and her desired shift was "Monday, Wednesday . . . ."[6]  (Dkt. no. 47-26 at 2.)  In April 2022, Plaintiff's schedule varied each week.  (Def. Resp to Pl. 56.1 ¶ 14; dkt. no. 47-27.)

Chaudhry was responsible for creating the schedules for certain departments but would discuss and collaborate with Mariscal on making and finalizing the schedules.  (Def. Resp. to Pl. 56.1 ¶ 34.)  Chaudhry and Mariscal had to submit the schedules to their employees by the tenth of the month.  (Def. Resp. to Pl. 56.1 ¶ 36.)  To do so, all employees were required to email management, by the first of the month, their availability to work for the following month.  (Mariscal Decl. at 3.)  According to Chaudhry's declaration, they "did not permit employees to tell

---

[6] The record does not reflect what other days of the week were listed on the application because the document provided was cut off.  However, the record reflects that Plaintiff was hired with limited availability.  (Dkt. no. 47-26 at 2-3; see also dkt. no. 47-15 at 13 ("the only day she indicated on her application that she could not work was Tuesday").)

[them] their availability to work orally rather than in writing."[7]

(Mariscal Decl. at 3.)

> If employees submitted their availability after the first of
> the month, [Chaudhry] would accept it as long as [she] had
> not yet finished creating the schedule for the following
> month. Once the schedule was finalized, changes for reasons
> not protected by law (e.g., conflict with school, schedule or
> another job) could only be made if operationally feasible.
> [They] granted requests from employees to work a certain
> schedule if it was operationally feasible to do so. If such
> requests were not operationally feasible, the employee would
> be invited to obtain a formal accommodation from CityMD's
> Employee Relations department . . ., provided that the reason
> a certain schedule was needed was due to medical reasons,
> pregnancy, religion, or some other legally qualifying basis.

(Id.; Def. Resp. to Pl. 56.1 ¶¶ 36-37, 39.) According to the
Company's policies, "any individual who would like to request an
accommodation . . . should contact their Manager/Supervisor" and
"[a]ccommodation requests can be made in writing using a form which
can be obtained from their Manager/Supervisor." (Dkt. no. 47-32
at 1; Def. Resp. to Pl. 56.1 ¶ 114.) The form was called "CityMD's
Reasonable Workplace Accommodation Request Form." (Salazar Decl.
at 1; dkt. no. 51-1 at 2-3.) "If Employee Relations granted an
employee a formal accommodation related to the employee's
schedule, [Mariscal] would coordinate with [his] manager or SMs of
other CityMD urgent care locations as necessary to ensure that
West 14th Street had appropriate staff coverage so that the employee

---

[7] Although Plaintiff contests this, email evidence shows that
Plaintiff put all scheduling requests at issue in this case in
writing, even if she also made them orally.

would receive the schedule request that was approved by Employee Relations." (Mariscal Decl. at 3.)  If Mariscal did not hear back from Employee Relations, he would reach out to the Human Resources Business Partner so that they could reach out to Employee Relations.  (Def. Resp. to Pl. 56.1 ¶ 97; but see Def. Resp. to Pl. 56.1 ¶ 104 (stating Mariscal did "not know what to do if Employee Relations does [sic] not reach out to [an] employee").)

On April 24, 2022, Chaudhry and Mariscal held a PSR meeting for Q2 at the West 14th Street location.  (Dkt. no. 47-15 at 1-2; see also dkt. no. 50-9 at 2-3.)  Based on the contemporaneous summary that Chaudhry sent to Martinez, CC'ing Perez and Mariscal, all employees, except one, wanted to increase their hours to 38. (Dkt. no. 47-15 at 2.)  The summary stated, "[Mariscal] and [Chaudhry] agreed that [they] would implement this change starting the first week of May.  [They] reiterated that the team has to be careful and clock in only for those hours."  (Id.)

Plaintiff testified that she requested an accommodation related to her schedule for the first time at the end of May 2022. (Dkt. no. 47-9, 195:8-13.)  Plaintiff claims that "Mariscal acknowledged [her] request for a reasonable accommodation, but directed [her] to speak to Maham Chaudhry instead, because she 'did the scheduling.'"  (Pl. Aff. at 2.)  Plaintiff claims that when she discussed her requested accommodation with Chaudhry orally, Chaudhry made Plaintiff feel like a "burden," and no

accommodation was granted.  (Dkt. no. 47-9, 192:17-18, 194:10-11, 196:15-16, 201:19-25-202:1-12.)  She also testified that it was "always a push back" from Mariscal and Chaudhry. (Id. at 193:5-8.)  Plaintiff claims that her scheduling accommodation request was because it was "too strenuous for [her] pregnancy" and she was "getting bigger [and] it was overwhelming" and "too taxing on her body."  (Pl. Aff. at 2; dkt. no. 47-9, 48:5-13; 47-12, 140:4-15.)

On May 8, 2022, Plaintiff emailed Chaudhry, Mariscal, and Leora Hourizadeh regarding her June availability.  (Dkt. no. 47-20 at 1.)  Plaintiff wrote, "I am available only Monday all day Wednesday 8-8pm and Friday 8-4 pm due to my prenatal appointments." (Id.)  At the time, Mariscal was out of the office and returned on May 22.  (Dkt. no. 50-5 at 2.)

On May 10, 2022, Chaudhry and Plaintiff communicated via text message about scheduling.  (Dkt. no. 47-21.)  Plaintiff wrote that she "cannot stay till 6 on Tuesdays anymore because [she has] to get [her] daughter . . . [and she] unfortunately cannot work weekends anymore because [her] fiancé's schedule has changed and [she doesn't] have anyone to watch [her] child."  (Id. at 2.) Chaudhry responded that "[t]he June schedules were already made and they're going to be posted soon.  [Mariscal] had sent out an email saying that requests were due by May 1." (Id. at 2-3.)  In addition, Chaudhry wrote to Plaintiff that she would connect Plaintiff with Employee Relations "so [they] can figure out how to

14

move forward with these requests since they are related to childcare and prenatal appointments." (Id. at 2-3.) Chaudhry also wrote, "I'm sorry I know it's really tough and I don't want you to feel like I'm just dismissing your requests, but I have to schedule for the sites need." (Id. at 2-4.) Plaintiff stated, "we're understaffed. It's exhausting." (Id. at 3-4.) Plaintiff also said, "[i]t does feel like [] it is dismissive." (Id.) Chaudhry responded, inter alia, "I don't want you to feel not supported." (Id. at 4.)

That same day, Chaudhry emailed Plaintiff connecting her to "ER Recipients" (er@citymd.net). (Dkt. no. 47-19 at 1, 4-5; dkt. no. 47-23 at 2.) The email was practically identical to the one Mariscal sent on March 30, 2022. On May 11, 2022, Plaintiff responded "MetLife was already given by [Mariscal] weeks ago if you're referring to my maternity leave. I have been awaiting a couple weeks now to get ahold of someone, but I don't plan on taking that until I get closer. I have the thread of that if needed & [Mariscal] was notified on that. Also, can be furtherly discussed on the 23rd." (Dkt. no. 47-19 at 4-5.) On May 12, 2022, Chaudhry replied, "[t]his was a separate connect for schedule accommodations. I'm going to reconnect you with HR, since they haven't reached out in a few weeks, just so you have access to these resources." (Id.) As mentioned, Plaintiff never heard back from Employee Relations. (Def. Resp. to Pl. 56.1 ¶ 107.)

On May 10, 2022, the same day as the text message conversation, Chaudhry emailed Martinez and Erika Schreiber, CC'ing Perez, Mariscal and Angel Suazo, summarizing her text message conversation with Plaintiff. (Dkt. no. 47-26 at 4.) Perez responded "in terms of feedback as soon as she mentioned you guys were 'understaffed' I would shut that down immediately. And just reiterate that the site is staffed due to volume and you guys are correctly staffed right now, as she was hired during Covid this is business as usual." (Id. at 3.)

On May 24, 2022, Mariscal met with Plaintiff to follow up on Plaintiff's text message conversation with Chaudhry and discuss time and attendance. (Dkt. no. 47-15 at 11-15.) According to the contemporaneous summary, which Mariscal sent to Martinez and CC'd Perez, Plaintiff complained that there was only one PSR to open and close and that there was "minimal support from management at the front desk." (Id. at 13.) Regarding scheduling concerns, Plaintiff explained that "her fiancé got a second job and he works on both Saturday and Sunday. She explained that there would be no one to watch her daughter on the weekends." (Id.) Plaintiff emphasized that "she has been very flexible with her availability and has supported management with any days they need." (Id.) Plaintiff also noted that "she has several appointments regarding her pregnancy." (Id.) Mariscal wrote, "I told her that the schedule was made to support the needs of the business. I

expressed that although she was hired with limited availability, the only day she indicated on her application that she could not work was Tuesday.  I emphasized that she must work a weekend but that I am more than happy to review the schedule in-depth when [Chaudhry] returns to the office."  (Id.)  Mariscal gave Plaintiff a flyer which includes information on the Company's new KinderCare childcare program and explained that "childcare is not a covered reason to accommodate her schedule request," but the flyer is a great resource that could further support her.  (Id. at 14.) Mariscal informed Plaintiff of her time and attendance infractions:  she was late on May 23 by 7 minutes and May 24 by 9 minutes.  (Id.)  Plaintiff said she "must drop her daughter off at her daycare and then travel to work."  (Id.)  Martinez replied to Mariscal's email summary of the May 25, 2022 meeting asking, "since Jesenia was connected to ER on 03/30 [March 30, 2022], for her pregnancy are any dates that she is requesting []off for doctor appointments?"  (Id. at 13.)  Mariscal responded "June 1st, 7th, and 21st."  (Id. at 11.)

Regarding Plaintiff's June schedule, Plaintiff worked two Tuesdays that followed a 16-hour day on Monday.  (Dkt. nos. 47-27, 47-28; but see dkt. no. 47-13.)

On May 26, 2022, Plaintiff sent an email to Mariscal and Hourizadeh regarding her July availability stating, "As we have discussed for July, I would like it to stay the same as JUNE( after

the corrections) I am willing to work every other weekend." (Dkt. no. 47-20 at 2.) On May 29, 2022, Mariscal forwarded the request to Chaudhry stating "FYI." (Id.) Both Plaintiff and Mariscal did not remember what "after the corrections" referred to.[8] (Dkt. no. 47-9 at 319:6-17; dkt. no. 47-12 at 202:9-14; Def. Reply to Pl. Resp. of Def. 56.1 ¶ 27).

In or around June 2022, Plaintiff was visibly pregnant. (Def. Resp. to Pl. 56.1 ¶ 26.)

On June 24, 2022, Plaintiff sent an email to Mariscal and Hourizadeh regarding her August schedule, stating "I am sending my availability for August to remain the same but if you can make it MONDAY, WEDNESDAY AND FRIDAY because as I get bigger working a 16-hour shift then to wake up and do an 8hr is getting strenuous on me." (Dkt. no. 47-20 at 4.) She also detailed her weekend availability. (Id.) Plaintiff concluded the email with "PLEASE AND THANK YOU, I LOVE YOUUUUU." (Id.) Mariscal responded and CC'd Chaudhry. (Id. at 3.)

Plaintiff was always permitted to leave work to attend her prenatal appointments and therefore never missed any prenatal appointments because of her work schedule. (Dkt. no. 47-9, 131:16-

---

[8] In Defendants' Memorandum of Law in Support of Defendants' Motion of Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment, Defendants hypothesize what "the corrections" could have referred to. (Def. Br. at 27 n. 3.)

22, 197:25-199:3, 201:6-14; Def. Reply to Pl. Resp. of Def. 56.1 ¶ 25.)

**D. Plaintiff's Uniform Request**

The Company's required uniform was "black pants, CityMD top and a name tag." (Pl. Aff. at 4; Def. Resp. to Pl. 56.1 ¶ 68.)

According to Chaudhry's declaration, on June 27, 2022, Chaudhry spoke to Plaintiff about not wearing the proper uniform.[9] (Chaudhry Decl. at 3.)  Plaintiff informed Chaudhry that her current uniform did not fit her properly and that she needed a maternity uniform.  (Id.)  "This was the first time [Plaintiff] said anything to management about needing a maternity uniform." (Id.)  On June 27, that same day, Chaudhry ordered Plaintiff a maternity uniform.  (Dkt. no. 47-22.)

On the other hand, Plaintiff alleges that she started asking Chaudhry and Mariscal about a maternity uniform before June 2022. (Def. Resp. to Pl. 56.1 ¶ 71.)

**E. The Company's Applicable Policies**

The Company has policies relating to reasonable accommodations and cooperative dialogue.  (Dkt. no. 47-32 at 1-3; Def. Resp. to Pl. 56.1 ¶ 118.)  It also has workplace policies and

---

[9] Neither party submitted as evidence an email summarizing this alleged meeting, which appears to be management's practice after speaking with employees about various work-related topics.

expectations that detail its standards of conduct.  (Dkt. no. 47-32 at 1-6.)  For example,

> [a]ny violation or deviation from the Company's Code of Conduct or rules and regulations may result in disciplinary action up to and including immediate termination. . . . Types of behavior and conduct that SUMMIT CITYMD considers unacceptable include, but are not limited to the following: . . . [a]ltering, falsifying, tampering with time records, or recording time on another employee's time records or on behalf of another employee[;] . . . [e]xcessive unexcused absenteeism or tardiness[;] . . . [w]earing improper attire or having an inappropriate personal appearance . . . ."

(Id. at 5.)  Additionally, the Company's policies state "[t]he Company does not have a formal progressive discipline policy requiring a set number of warnings or counseling sessions. Instead, each case is considered based on its own facts.  In the case of misconduct or violation of the Company's policies, immediate termination may, in the sole discretion of the Company, be deemed appropriate or necessary."  (Id. at 6.)

## F. Plaintiff's Termination

On June 28, 2022, Chaudhry and Mariscal spoke to Plaintiff about her recent conduct.  (Dkt. no. 47-7 at 7-8.)  Chaudhry sent a summary of the meeting to Martinez, CC'ing Mariscal and Perez. (Id.)  According to the contemporaneous summary, camera footage showed that, on June 27, Plaintiff left the clinic at 11:05 p.m. without informing management.  (Id.)  Additionally, Plaintiff did not clock out until 11:24 p.m.  (Id.)  When first asked about this, Plaintiff stated that she was at work until 11:20 p.m.  (Id.)

Mariscal noted that while management is not sure how she clocked out, "clocking out on the phone is a terminable offense."  (Id.) He added that "this has occurred at this site before, and although it is a violation of company policy, let this be a one and done deal." (Id. at 7.)  Plaintiff stated, "[y]ou can clock me out at 11:05PM, because they didn't clock me out.  I wasn't trying to steal company time."  (Id.)  According to the summary, Plaintiff did not say who clocked her out because she did not want to "throw anyone under the bus and [] would rather take the heat [her]self." (Id.)  Mariscal explained "that it's still a violation of company policy . . . [and they] will be investigating further and will circle back with her."  (Id. at 7-8.)  There is disagreement among the parties about whether Plaintiff asked Mariscal if she could leave early on June 27. (Def. Resp. to Pl. 56.1 ¶¶ 193, 198; Def. Reply to Pl. Resp. of Def. 56.1 ¶ 30.)

Additionally, during this meeting, Mariscal noted that Plaintiff also left at 3:40 p.m. on June 28, 2022, without notifying management about her whereabouts.  (Dkt. no. 47-7 at 7-8.)  Mariscal further stated that "upon review of the camera footage, Jesenia was not in uniform at the front desk with patients present in the lobby."  (Id. at 7.)  Plaintiff said she was wearing her Company-branded fleece, but Mariscal responded that in the evening it was open with a graphic tee visible.  (Id.)  Management expected Plaintiff to keep her fleece zipped up if she was not

21

wearing the Company-branded shirt underneath.  (Def. Resp. to Pl.
56.1 ¶ 81.)  Plaintiff noted that "her scrub tops were too small,"
and Chaudhry "reminded her that upon her first-time communication
with management yesterday [June 27, 2022] regarding this, [she]
had ordered her maternity scrubs and they should be arriving soon."
(Dkt. no. 47-7 at 7.)

At the end of the summary, Chaudhry wrote

[o]verall, management will continue to monitor.  As
mentioned, Jesenia failed to communicate her absence
yesterday, lied to management today about the details of the
incident.  Jesenia left, again, today without informing
management about her whereabouts.  Jesenia fails to wear her
uniform after management has discussed this with her numerous
times.  Due to Jesenia's lack of accountability and complete
violation of company policy, management would like to move
forward with termination.

(Id. at 7-8.)  On June 30, 2022, Martinez prepared, and Mariscal
and Perez approved, the document labeled "Confidential Termination
Recommendation," which was sent to Salazar.  (Dkt no. 47-16 at 1.)

All four versions of the document submitted to the Court
include the following: "Overall Reason for Term: Time Card Fraud;"
and "Potential Liability and/or Mitigating Circumstances?
Connected to ER on 02/17/20, 3/31/22 (disclosed pregnant),
05/10/22."  (Dkt. no. 47-16 at 9-20.)

Martinez testified that the "Confidential Termination
Recommendation" document includes a "snapshot of the entirety of
the team member's performance and behavior throughout . . . their
[sic] tenure," based on records of conversations reviewed but that

22

the termination of the employee's employment is not based on everything that is listed in the "Confidential Termination Recommendation" document. (Dkt. no. 47-11, 127:11-18; Def. Resp. to Pl. 56.1 ¶ 187.) According to Salazar's declaration, "[t]he 'Overall Reason for Term' category on the Termination Recommendation form lists only one reason for termination, and is not designed to capture all of the reasons for an employee's discharge." (Salazar Decl. at 2; Def. Resp. to Pl. 56.1 ¶ 189.)

Three versions of the document read,

Recommended Termination Verbiage: Jesenia, you have falsified your time card. Failure to properly record time or otherwise violating this policy (such as by altering, falsifying, tampering with time records, or recording time on another employee's time records) is a violation of company policy. We will be terminating your employment effective immediately.

(Dkt. no. 47-16 at 14, 17, 20.) Based on feedback from Salazar, received via email on July 1, 2022, the final version of the document reads,

Recommended Termination Verbiage: Jesenia, on June 27, 2022, you abandoned your shift by leaving early without notifying management. Further, you did not follow proper protocol in clocking out, which lead to a discrepancy in your punch out time compared to the time you left. Based on your failure to follow company protocols and your violation of the standards of conduct, Summit Health will be terminating your employment effective immediately.

(Id. at 3, 5, 11.) According to Defendants, the "Recommended Termination Verbiage" is only the recommended language for management to use when informing the employee of her discharge and

23

is not meant to capture all of the reasons for the termination. (Def. Resp. to Pl. 56.1 ¶ 188.)

On July 5, 2022, after Plaintiff's shift, Plaintiff was terminated. (Dkt. no. 47-16 at 6, 8; see also dkt. no. 50-6 at 2.) Based on a summary of the meeting prepared by Chaudhry, which she sent to Martinez, CC'ing Perez, Mariscal and others, during the meeting Plaintiff's response was, "why couldn't y'all just give me a write up?" (Dkt. no. 50-8 at 2.)

**G. Other Mentioned Employees**

Throughout the parties' submissions, many other employees are mentioned as a point of comparison.

With respect to scheduling, Plaintiff claims that Chanelle Cato was allowed to work Monday, Wednesday, Friday. (Def. Resp. to Pl. 56.1 ¶ 158.) However, according to the schedule, Cato did not work Monday, Wednesday, Friday. (Dkt. no. 47-28 at 1-2.)

Concerning the Shift Supervisor position, Jamalette Otero was recommended for promotion by Mariscal and interviewed but then not selected for the position. (Def. Resp. to Pl. 56.1 ¶ 135.) Fiona Purchase, who was hired after Plaintiff, was promoted to Shift Supervisor, and transferred to another location, in November 2021. (Id. ¶ 133; Mariscal Reply Decl.) Jonathan Carcamo was promoted to Shift Supervisor and transferred to another location in January 2022. (Def. Resp. to Pl. 56.1 ¶ 134; Mariscal Decl. at 5.) He was later promoted to Assistant Site Manager. (Def. Resp. to Pl.

56.1 ¶ 164.)    Prior to Carcamo's promotions, Mariscal informed Carcamo that they would have biweekly touch bases to, among other things, "get him where he needs to be." (Def. Resp. to Pl. 56.1 ¶ 145.)    To add, Carcamo was spoken to in June 2021 about time card fraud because on multiple occasions he clocked into work from his phone before he entered the building. (Def. Resp. to Pl. 56.1 ¶¶ 160, 162.)    Specifically, one instance involved Carcamo's clocking in approximately three hours early because he was having parking trouble. (Dkt. no. 47-17 at 3, 7.)    Defendants contend that when Carcamo was first spoken to he volunteered the information and that he was a stronger performer than Plaintiff. (Def. Resp. to Pl. 56.1 ¶¶ 160, 162.)    Carcamo was issued a final written warning. (Dkt. no. 47-17 at 4-5.)    Additionally, in September 2022, Carcamo was late to work by 50 minutes and was issued a written warning. (Id. at 9-14.)    Hourizadeh was promoted to Shift Supervisor in or around March 2022. (Def. Resp. to Pl. 56.1 ¶ 128; dkt. no. 47-8 at 10.)    Chelsea Torres, who had less seniority than Plaintiff within the Company, was promoted to Shift Supervisor after July 2022. (Def. Resp. to Pl. 56.1 ¶¶ 129-30.) As of June 2022, the goal for Torres was to promote her to Senior PSR by Q4 2022 or Q1 2023. (Def. Resp. to Pl. 56.1 ¶ 131.)

In terms of performance, Plaintiff claims that Cato was "late all the time." (Pl. Aff. at 3.)    Plaintiff claims that Taylor Bowne, who was listed higher than Plaintiff on the June 16, 2022

staff rankings list, had nonreliability, time, and attendance issues. (Def. Resp. to Pl. 56.1 ¶ 157.)

Regarding wearing a proper uniform, there is disagreement as to whether Karina Melo wore leggings. (Def. Resp. to Pl. 56.1 ¶ 156; Mariscal Decl. at 5.) Plaintiff testified that Melo told her that Mariscal spoke to Melo about her uniform. (See dkt. no. 47-9, 414:22-415:12.)

With regard to disciplinary actions, Cato did not receive any discipline for allegedly clocking Plaintiff out. (Def. Resp. to Pl. 56.1 ¶ 167.) At the time, Mariscal said they would investigate the situation, but later Defendants claim that Mariscal and Chaudhry did not feel it was appropriate to assume or accuse Cato of wrongdoing without evidence. (Id. ¶ 169.) Instead, Defendants claim they did not know it was Cato who clocked Plaintiff out on June 27 until Plaintiff's deposition. (Id. ¶ 167.)

Additionally, Ciara Rodriguez was terminated shortly after she requested, and was granted, a workplace accommodation due to medical reasons. (Def. Resp. to Pl. 56.1 ¶ 171; dkt. no. 47-14.) Defendants claim she was terminated due to time and attendance issues. (Id.)

**H. Procedural History**

On November 4, 2022, Plaintiff commenced the instant lawsuit asserting various claims based on alleged violations of various laws governing discrimination and retaliation. (Compl.) On

26

January 9, 2023, Defendants answered.  (Answer [dkt. no. 10].)  On April 5, 2024, Plaintiff filed a motion for summary judgment. (Dkt. no. 47.)  On May 6, 2024, Defendants opposed the motion and filed a motion for summary judgment.  (Dkt nos. 48, 49, 50, 51, 52.)  On June 6, 2024, Plaintiff opposed.  (Pl. Reply Br.)  On June 27, 2024, Defendants replied.  (Dkt. nos. 54, 55, 56.)

## II.  **Legal Standards**

### A.  **Summary Judgment**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  Id.  The moving party bears the initial burden of "showing that the materials cited do not establish the . . . presence of a genuine dispute."  Garcia v. JonJon Deli Grocery Corp., No 13 Civ. 8835 (AT), 2015 WL 4940107, at *2 (S.D.N.Y. Aug. 11, 2015) (quoting Fed. R. Civ. P. 56 (c)(1)(B)); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant satisfies the burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact."  Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d

Cir. 2011).  "Conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." Flores v. United States, 885 F.3d 119, 122 (2d Cir. 2018) (quoting Kulak v. City of N.Y., 88 F.3d 63, 71 (2d Cir. 1996)).

In assessing the record, the Court "must view the evidence in the light most favorable to the . . . [non-moving] party," Tolan v. Cotton, 572 U.S. 650, 657 (2014), and "resolve all ambiguities and draw all reasonable inferences against the movant," Caronia v. Philip Morris USA, Inc., 715 F.3d 417, 427 (2d Cir. 2013).

**B.  Discrimination**

The Pregnancy Discrimination Act (PDA) is an amendment to Title VII of the Civil Rights Act of 1964 and establishes that discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions," constitutes unlawful sex discrimination under Title VII.  42 U.S.C. § 2000e(k).

Title VII discrimination claims are evaluated under the well-established three step burden shifting analysis outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See also Zann Kwan v. The Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013).  First, Plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case.  Id.  This burden is minimal.  McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001).  The Court outlines each claim's prima facie elements in its relevant section below.  Second, where Plaintiff makes out a

prima facie case, the burden of production shifts to the employer, Defendants, to articulate a legitimate, clear, specific, and nondiscriminatory reason for the action. Xiang v. Eagle Enterprises, LLC, No. 19-CV-1752 (LJL), 2022 WL 785055, at *12 (S.D.N.Y. Mar. 15, 2022). Lastly, if Defendants articulate a nondiscriminatory reason for its behavior, the burden shifts back to Plaintiff to prove that discrimination was the real reason for the employment action and Defendants' reason was merely pretext. Id. at *13.

Under NYCHRL, discrimination claims must be analyzed "separately and independently" as the NYCHRL's provisions are "uniquely broad" and should be construed "broadly in favor of discrimination plaintiffs." Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013) (citing Hernandez v. Kaisman, 103 A.D.3d 106, 957 N.Y.S.2d 53, 58 (1st Dep't 2012)). "While claims under NYCHRL are more liberally construed than claims under Title VII . . . the NYCHRL does not alter the kind, quality or nature of evidence that is necessary to support or defeat a motion for summary judgment under Rule 56." Xiang, 2022 WL 785055, at *18. To prevail on a discrimination claim under NYCHRL, Plaintiff must show that she was treated "less well than other similarly situated employees, at least in part for discriminatory reasons." Id. For Plaintiff's NYCHRL claim to survive, she must allege "differential treatment that is 'more than trivial,

insubstantial, or petty.'" <u>Torre v. Charter Comm'cns, Inc.</u>, 493 F. Supp. 3d 276, 285 (S.D.N.Y. 2020) (quoting <u>Gorman v. Covidien, LLC</u>, 146 F. Supp. 3d 509, 530 (S.D.N.Y. 2015)).

Following the New York legislature's 2019 amendment to the NYSHRL, <u>see</u> N.Y. Exec. Law § 300, courts must now scrutinize discrimination claims brought pursuant to the NYSHRL under a lenient pleading standard similar to the standard for NYCHRL discrimination claims. <u>Doolittle v. Bloomberg L.P.</u>, No. 22 Civ. 09136 (JLR), 2023 WL 7151718, at *7 (S.D.N.Y. Oct. 31, 2023).[10]

### C.    Retaliation

Title VII retaliation claims are also evaluated under the well-established <u>McDonnell Douglas</u> burden shifting analysis.  The Court outlines the prima facie elements in the relevant section below, <u>infra</u> Section III.B.1.

---

[10] The 2019 amendment stated that the existing NYSHRL provisions relating to discrimination claims should be "construed liberally" regardless of how analogous federal pleading standards have been construed, N.Y. Exec. Law § 300, reversing the prior practice of analyzing NYSRHL employment discrimination claims under the same standard as Title VII.  <u>See, e.g.</u>, <u>Helmes v. South Colonie Cent. School Dist.</u>, 564 F. Supp. 2d 137, 152 (N.D.N.Y. 2008).  While some courts have noted it is unclear if the 2019 amendment made the NYCHRL and NYSHRL pleading standards the same, <u>see Shaughnessy v. Scotiabank</u>, No. 22 Civ. 10870 (LAP), 2024 WL 1350083, at *10 (S.D.N.Y. March 29, 2024); <u>Nezaj v. PS450 Bar & Rest.</u>, 719 F. Supp. 3d 318, 335 n.3 (S.D.N.Y. 2024), other courts have treated the standards as aligned, <u>see Wright v. City of N.Y.</u>, No. 23 Civ. 3149 (KPF), 2024 WL 3952722, at *6 (S.D.N.Y. Aug. 27, 2024); <u>Xiang</u>, 2022 WL 785055, at *12.

As is the case for discrimination claims, Plaintiff shoulders a more relaxed burden to plead a sufficient retaliation claim under the NYCHRL and the NYSHRL.  See McHenry v. Fox News Network, LLC, 510 F. Supp. 3d 51, 67 (S.D.N.Y. 2020) ("Retaliation claims under the NYCHRL are subject to a broader standard than under . . . Title VII."); see also Arazi v. Cohen Bros. Realty Corp., 20 Civ. 8837 (GHW), 2022 WL 912940, at *16 (S.D.N.Y. Mar. 28, 2022) (noting the "NYCHRL's more liberal pleading standard applies" to NYSHRL retaliation claims following the 2019 statutory amendments).[11]

A complaint alleging retaliation under this more lenient standard need not plead that Plaintiff suffered an adverse employment action.  McHenry, 510 F. Supp. 3d at 67.  Instead, Plaintiff is only required to "'show that something happened that was reasonably likely to deter a person from engaging in protected activity.'"  Id. (quoting Xiang, 2020 WL 248941, at *9); see also Arazi, 2022 WL 912940, at *17.  Plaintiff's burden to allege plausibly the other three prongs necessary to state a prima facie retaliation claim under Title VII, see infra Section III.B.1, remains the same for NYCHRL and NYSHRL claims.  McHenry, 510 F. Supp. 3d at 67 (citing Malena v. Victoria's Secret Direct, LLC,

---

[11] Similar to the pleading standards for discrimination claims under the NYSHRL and NYCHRL, there is some disagreement regarding the pleading standards for retaliation under the two statutes.  See Shaughnessy, 2024 WL 1350083, at *12 (noting that "the NYCHRL applies a more lenient standard" than the standard for NYSHRL retaliation claims).

886 F. Supp. 2d 349, 362 (S.D.N.Y. 2012)); see also Arazi, 2022 WL 912940, at *17; Xiang, 2020 WL 248941, at *9.

## III. Discussion

### A. Discrimination

#### 1. Failure to Accommodate[12]

Plaintiff alleges that Defendants' failure to accommodate her pregnancy constitutes discrimination under federal, state, and city statutes.[13]

Under Title VII, the McDonnell Douglas framework requires that Plaintiff must first establish a prima facie case by showing that (1) she belongs to a protected class; (2) she sought an accommodation; (3) her employer did not accommodate her; and (4) the employer did accommodate others' similar in their ability or inability to work. Young v. United Parcel Serv., Inc., 575 U.S. 206, 229 (2015); see also Legg v. Ulster Cnty., 820 F.3d 67, 73 (2d Cir. 2016).

NYSHRL states

> It shall be an unlawful discriminatory practice for an employer, licensing agency, employment agency or labor

---

[12] Although Plaintiff alludes to a potential claim for failure to accommodate Plaintiff's uniform request, the Complaint discusses the issues surrounding Plaintiff's uniform in relation to the wrongful termination and retaliation claims. The Court follows suit.

[13] The parties reference the Americans with Disabilities Act (ADA) in their failure to accommodate arguments; however, the Court did not consider these arguments because Plaintiff did not allege any claim pursuant to the ADA in its Complaint.

> organization to refuse to provide reasonable accommodations to the <u>known</u> disabilities, or pregnancy-related conditions, of an employee, prospective employee or member in connection with a job or occupation sought or held or participation in a training program.

N.Y. Exec. Law § 296(3)(a) (emphasis added).  Courts have found that a reasonable accommodation must be arrived at through an interactive process, but there is no independent cause of action under NYSHRL for a failure properly to engage in the interactive process.  <u>Greenbaum v. N.Y. City Transit Auth.</u>, No. 21-1777, 2022 WL 3347893, at *5 (2d Cir. Aug. 15, 2022).

NYCHRL awards even greater protections than NYSHRL.  Under NYCHRL

> it shall be an unlawful discriminatory practice for an employer to refuse to provide a reasonable accommodation . . . to the needs of an employee for the employee's pregnancy, childbirth, or related medical condition that will allow the employee to perform the essential requisites of the job provided that such employee's pregnancy, childbirth or related medical condition is <u>known or should have been known</u> by the employer.

N.Y.C. Admin. Code § 8-107(22)(a) (emphasis added).  Thus, an employer is required to act proactively to accommodate the pregnancy of an employee even if the employee does not request an accommodation.  Additionally, employers must engage in "cooperative dialogue within a reasonable time with a person who has requested an accommodation or who the covered entity has notice

may require such an accommodation." N.Y.C. Admin. Code § 8-107
(28)(a)(3). The failure to engage in a cooperative dialogue is
independently actionable under the NYCHRL. Cangro v. N.Y. City
Dep't of Fin., No. 23 Civ. 10097 (LAP), 2024 WL 3833971, at *7
(S.D.N.Y. Aug. 14, 2024).

### a) Failure to Accommodate under Title VII and NYSHRL

It is undisputed that Plaintiff belonged to a protected class
because she was pregnant. Plaintiff alleges that she sought an
accommodation relating to her June, July, and August schedules and
did not receive the requested accommodation.

The Court first turns to Plaintiff's requests for her June
and July schedules. Plaintiff testified that she requested an
accommodation related to her schedule for the first time at the
end of May 2022. (Dkt. no. 47-9, 195:8-13.) At that time,
Plaintiff claims that she made scheduling requests both orally and
in writing. Specifically, Plaintiff alleges that she requested
Monday, Wednesday, Friday, not only because the schedule was "too
strenuous for [her] pregnancy" and she was "getting bigger [and]
it was overwhelming" and "too taxing on her body," which she
articulated orally, but also because of her prenatal appointments,
which she explicitly wrote in her email requesting her June[14]

---

[14] Plaintiff's email request for July stated, "stay the same as
JUNE( after the corrections)." (Dkt. no. 47-20 at 2.)
Defendants argue that Plaintiff did not make an (cont'd)

schedule.  (Pl. Aff. at 2; dkt. no. 47-9, 48:5-13; dkt. no. 47-12, 140:4-15.)

Plaintiff's assertion that she orally requested the schedule and explained it was because of physical ailments relating to her pregnancy is insufficient to raise an issue of fact because of uncontested, documented proof of contemporaneous conversations. Laboy v. CSC Holdings, LLC, No. 18 Civ. 3726 (ENV) (CLP), 2021 WL 4205179, at *12 (E.D.N.Y. Mar. 25, 2021) (Plaintiff's reliance on uncorroborated claims is insufficient to defeat summary judgment.) First, Plaintiff's email request for June stated the reason for the request was "due to my prenatal appointments." (Dkt. no. 47-20 at 1.)  Second, in the days following Plaintiff's email request regarding her June schedule, Plaintiff communicated to Chaudhry and Mariscal on several occasions that the reason for her request was due to childcare obligations and prenatal appointments.  (Dkt. no. 47-21 at 2-3; dkt. no. 47-26 at 4; dkt. no. 47-15 at 11-14.) If Plaintiff's request was in fact about pregnancy-related physical ailments, she would have said so in at least one of the documented communications.  Third, Plaintiff's request for her

_____

(cont'd) accommodation request for her July schedule because the email did not mention anything pregnancy related.  Given that both Plaintiff and Mariscal did not remember what "after the corrections" referred to, the Court assumes that Plaintiff requested the same schedule she had for June and for the same reason of prenatal appointments.  (Dkt. no. 47-9, 319:6-17; dkt. no. 47-12, 202:9-14; Def. Reply to Pl. Resp. of Def. 56.1 ¶ 27.)

August schedule stated, "as I get bigger working a 16-hour shift
then to wake up and do an 8hr is getting strenuous on me." (Dkt.
no. 47-20 at 4.)  The use of "get" and "getting" reads that these
are new issues, as opposed to the same ones she mentioned back in
May.  For the foregoing reasons, the Court views Plaintiff's
scheduling request for June and July as solely relating to her
prenatal appointments and childcare obligations and not relating
to her work schedule being "too strenuous" or "too taxing."[15]

The next question regarding Plaintiff's June and July
schedules is whether Defendants accommodated Plaintiff's request.
Plaintiff did not receive the schedule she was hoping for because
her request was put in after the deadline, the schedule was already
made, and Company business needs could not accommodate it. (Dkt.
no. 47-21 at 2-4; dkt. no. 47-15 at 11-16.)  That said, Plaintiff
was always permitted to leave work to attend her prenatal
appointments and therefore never missed any prenatal appointments
because of her work schedule, which was the basis for her schedule
request. (Dkt. no. 47-9, 131:16-22, 197:25-199:3, 201:6-18; Def.
Reply to Pl. Resp. of Def. 56.1 ¶ 25.)  Human Resources was acutely
aware of the specific dates of her prenatal appointments. (Dkt.
no. 47-15 at 11.)  This shows that there was a dialogue between

---

[15] Childcare is not a covered reason to accommodate Plaintiff, so
the Court focuses only on the need to attend prenatal
appointments.

Plaintiff and management to ensure her accommodation, being able to go to her prenatal appointments, was effective. "Employers are not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee." <u>Noll v. Int'l Bus. Machs. Corp.</u>, 787 F.3d 89, 95 (2d Cir. 2015). Accommodations provided by the employer need only be "effective." <u>Id.</u> Additionally, Plaintiff agrees in her Reply and Opposition that "Plaintiff's prenatal appointments . . . [are] not an issue in this case." (Pl. Reply Br. at 28.) Therefore, under Title VII, Plaintiff failed to establish her prima facie case for the accommodation request relating to her June and July schedule.

The Court now turns to Plaintiff's schedule request for August, which stated, in writing, pregnancy-related reasons for the request, including "as I get bigger working a 16-hour shift then to wake up and do an 8hr is getting strenuous on me." (Dkt. no. 47-20 at 4.) The schedule was not yet created when Plaintiff was terminated. (Def. Resp. to Pl. 56.1 ¶ 63.) Defendants claim that Chaudhry and Mariscal intended to provide Plaintiff with her requested schedule for August had she remained an employee. (<u>Id.</u>) Plaintiff alleges that Defendants were not intending to accommodate her request because both Chaudhry and Mariscal were promoted.[16] (Def. Reply to Pl. Resp. of Def. 56.1 ¶ 29.) Plaintiff

---

[16] Chaudhry's promotion to Site Manager was agreed to and accepted on June 24, 2022, but did not commence until (cont'd)

also points to the fact that there was no "attempt" to accommodate her. (Def. Reply at 7.)  Plaintiff puts the cart before the horse. Mariscal created and posted the August 2022 schedule before beginning his new role.  (Id.)  Additionally, the deadline for employees to submit their requests was the first of the month, and Plaintiff's termination was recommended on June 30, so the absence of an "attempt" demonstrates nothing.  Therefore, under Title VII, Plaintiff failed to establish her prima facie case for the accommodation request relating to her August schedule.

Assuming arguendo, that Plaintiff could prove that Defendants did not effectively accommodate her for June/July and were not going to accommodate her for August, Plaintiff does not offer evidence that Defendants "did accommodate others' similar in their ability or inability to work." Young, 575 U.S. at 229.  Plaintiff claims that Cato was allowed to work Monday, Wednesday, Friday. (Def. Resp. to Pl. 56.1 ¶ 158.)  However, Plaintiff did not accurately cite the schedule because, according to the documentary evidence provided, Cato did not work Monday, Wednesday, Friday. (Dkt. no. 47-28.)  Additionally, Plaintiff claims that requests made after the deadline were granted and points to Chaudhry and Mariscal's ability to increase most employees' hours to 38 hours

_____

(cont'd) July 10, 2022.  (Dkt. no. 47-30.)  Mariscal was promoted to multi-site manager on July 2, 2022, and was notified of his promotion about a week prior to that.  (Def. Resp. to Pl. 56.1 ¶ 65.)

in less than a week.[17]   (Dkt. no. 47-15.)   This is not evidence
that others were treated better than Plaintiff as Plaintiff was a
part of the group that benefitted from this as well.

Because Plaintiff has not established a prima facie case under
Title VII on her failure to accommodate claim, Plaintiff's motion
for summary judgment on this issue is DENIED.  Defendants' motion
for summary judgment on this issue is GRANTED.

For a failure to accommodate claim, Title VII and NYSHRL have
two critical elements in common: (1) whether Plaintiff sought an
accommodation and (2) whether Defendants did not accommodate
Plaintiff's requests.  For the same reasons stated above, Plaintiff
does not satisfy even a more lenient pleading standard, and thus
the failure to accommodate her scheduling requests claim fails
under NYSHRL.   Thus, Plaintiff's motion for summary judgment on
this issue is DENIED.  Defendants' motion for summary judgment on
this issue is GRANTED.

### b) Failure to Accommodate and Failure to Engage in Cooperative Dialogue under NYCHRL

NYCHRL is different from Title VII and NYSHRL in that it
requires an employer to act proactively to accommodate and/or
engage in cooperative dialogue about the employee's pregnancy,

---

[17] Plaintiff also uses this fact to argue that Defendants could
have accommodated her late request; however, implementing a
global change is different from coordinating individuals'
schedules, and the global change was for the month of May, not
June or July.

childbirth, or related medical condition if it is <u>known or should</u> <u>have been known</u>.   N.Y.C. Admin. Code § 8-107(22)(a) (emphasis added).   Plaintiff made it "known" that she requested a specific schedule so that she could attend prenatal appointments and handle childcare obligations, which, as articulated above, Defendants effectively accommodated.   (<u>Supra</u> Section III.A.1.a.)

The issue here is whether Defendants failed to accommodate and/or engage in a cooperative dialogue about a pregnancy-related request that Defendants "should have known" about.

With respect to whether Defendants failed to accommodate a pregnancy-related request that Defendants "should have known" about, Plaintiff contends that the combination of the following acts should have prompted the Company proactively to accommodate her: (i) her requests that she not work certain days; (ii) her complaints that the Company was "understaffed" and "it was exhausting" and there was "minimal support;" and (iii) her visibly getting bigger in June.   Defendants argue that Plaintiff cannot show that Defendants had any reason to know that any of her comments were due to her being pregnant.   The statements about being understaffed and feeling exhausted were made in connection with Plaintiff's scheduling request, which she explicitly stated was being requested because of her prenatal appointments and childcare obligations.   (Dkt. no. 47-21 at 3-4.)   When Mariscal further asked about her conversation with Chaudhry, the

40

contemporaneous notes state that Plaintiff said Mariscal "was missed as there was minimal support from management at the front desk . . . ." (Dkt. no. 47-15 at 13.)  The statements are clearly about frustrations with work while Mariscal was out of the office. Therefore, Defendants had no reason to know that Plaintiff needed an accommodation because of pregnancy-related issues. Accordingly, Plaintiff's failure to accommodate her scheduling requests claim fails under NYCHRL; Plaintiff's motion for summary judgment on this issue is DENIED, and Defendants' motion for summary judgment on this issue is GRANTED.

Turning to whether Defendants failed to engage in a cooperative dialogue with Plaintiff, Plaintiff's affidavit states, "no one at CityMD has ever had a conversation with me regarding my pregnancy-related accommodation needs, potential/alternative accommodations that could be provided to me, or difficulties the Defendants would face in granting such accommodations." (Pl. Aff. at 3; Def. Resp. to Pl. 56.1 1 ¶¶ 27-30.)  This assertion is insufficient to raise an issue of fact in the face of documentary proof of conversations on May 10 and May 24 that were had with Plaintiff about her scheduling requests. (Dkt. no. 47-21; dkt. no. 47-15 at 11-14.)  In addition, there is documentary evidence of at least one additional conversation with Plaintiff about the specific dates of her prenatal appointments to ensure she did not

miss any.  (Dkt. no. 47-15 at 11-14.)  Laboy, 2021 WL 4205179, at *12.

Plaintiff also argues that neither Chaudhry nor Mariscal even knew what cooperative dialogue was.  (Dkt. no. 47-10, 201:11-16; dkt. no. 47-12, 166:7-11.)  Furthermore, Company policy states that "any individual who would like to request an accommodation . . . should contact their [sic] Manager/Supervisor" and "accommodation requests can be made in writing using a form ["CityMD's Reasonable Workplace Accommodation Request Form"] which can be obtained from their Manager/Supervisor."  (Dkt. no. 47-32 at 1; Def. Resp. to Pl. 56.1 ¶ 114; Salazar Decl. at 1; dkt. no. 51-1 at 2-3.)  Chaudhry and Mariscal did not give Plaintiff this form.  Instead, they sent boilerplate emails to Employee Relations. (Dkt. no. 47-18; dkt. no. 47-23 at 1-2; dkt. no. 47-15 at 8-9; dkt. no. 47-19 at 1, 4-5.)  And although they followed up, the emails were never responded to.  (Id.)  That said, at one point Plaintiff indicated that although she had been waiting a few weeks to contact someone in Employee Relations, being connected to Employee Relations was not a rush because she did not plan to take maternity leave for a bit.  (Dkt. no. 47-19 at 4-5.)  Additionally, Plaintiff's requested accommodation of attending her prenatal appointments was granted in effect so no further discussion with Employee Relations was required.  While Plaintiff unquestionably points out that there were people in need of additional training

42

at the Company, Defendants did not fail to engage in a cooperative dialogue with Plaintiff as required by NYCHRL. Thus, Plaintiff's motion for summary judgment on this issue is DENIED, and Defendants' motion for summary judgment on this issue is GRANTED.

### 2. Failure to Promote

#### a) Failure to Promote under Title VII

Under Title VII, the McDonnell Douglas framework requires that Plaintiff must first establish a prima facie failure to promote case, by alleging that (1) she is a member of a protected class; (2) she applied and was qualified for a job for which the employer was seeking applicants; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having Plaintiff's qualifications. Aulicino v. N.Y.C. Dep't of Homeless Servs., 580 F.3d 73, 80 (2d Cir. 2009); Brown v. Coach Stores, Inc., 163 F.3d 706, 709 (2d Cir. 1998). To satisfy the application piece of the second prong, a formal job application may not be required if the employee can demonstrate that "(i) the vacancy at issue was not posted, and (ii) the employee either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the employer." Petrosino v. Bell Atl., 385 F.3d 210, 227 (2d Cir. 2004); Jean-Gilles v. Rockland Cnty., No. 20 Civ. 1999 (AEK), 2024 WL 1348791, at *10 (S.D.N.Y. Mar. 29, 2024). The analysis for this claim turns on the second prong.

43

Looking at the second prong, Plaintiff did not formally apply for Senior PSR or Shift Supervisor and thus relies on the exception. Therefore, for the second prong, Plaintiff must demonstrate that (1) the Senior PSR or Shift Supervisor positions were not posted; (2) Plaintiff either had (a) no knowledge of the vacancy before it was filled or (b) attempted to apply for it through informal procedures endorsed by the Company; and (3) Plaintiff was qualified for the Senior PSR or Shift Supervisor positions. While there are many factual disputes underlying these elements, the Court focuses on whether Plaintiff was qualified for either position. (See supra Section I.A.)

The Court recognizes that Plaintiff received positive feedback in her current role; however, positive feedback in her current role does not mean that she is qualified for promotion to a higher-level role. In fact, the evidence that Plaintiff was not qualified for promotion is overwhelming. (See supra Section I.A.) Before Plaintiff announced her pregnancy or requested an accommodation, Plaintiff was consistently rated as "Meets Expectations" and at times received "Needs Improvement." (Id.) Management expressed doubts about Plaintiff's desire to be promoted based on her limited availability, which only worsened, and need to separate friendship from the professional. (Dkt. no. 47-31 at 4.) The record also reflects that Plaintiff left her shift on two occasions without informing management and had an

employee put in her time for her, conduct that also indicates she was not qualified for promotion. (Dkt. no. 47-7 at 7-8.)

On the other hand, the only evidence of high praise is Mariscal's letter of recommendation to Hunter College, which described Plaintiff as "top performing" and "one of the strongest employees [Mariscal has] worked with." (Dkt. no. 47-24.) Mariscal wrote "[i]f her performance at work is any indication of how she would perform at your school, Jesenia would be a positive addition." (Id.) Mariscal also wrote, "[i]t is my absolute honor to recommend Ms. Reyes as she is one of the best Patient Service Representatives I have encountered at CityMD" and "I recommend her without any reservations." (Id.) However, during Mariscal's deposition on August 31, 2023, he noted that comments in his recommendation letter were not true. (Dkt. no. 47-12 at 144-48.) He explained, without contradictions, that he wrote what he did because "he wanted her to go to school and actually achieve what she wanted to do." (Id. at 147:4-5.) This letter is insufficient to raise an issue of fact as to Plaintiff's qualifications for the higher positions.

In addition, Plaintiff alleges that she was never given the chance to show she was qualified for promotion, because she did not receive coaching or an opportunity to do tasks that someone in either higher-level role normally does, which management did for other people. (Def. Resp. to Pl. 56.1 ¶ 124.) However, Plaintiff

45

was given opportunities to perform tasks that typically a Senior
PSR or Shift Supervisor would do.  (Def. Reply to Pl. Resp. of
Def. 56.1 ¶ 12.)  And, Defendants state that Plaintiff did not
complete the tasks and demonstrated disinterest.  (Id. ¶ 13.)
Plaintiff, on the other hand, claims that her suggestion for more
organization at the PSR Workstation, when asked by Mariscal what
could be done to make the site better, shows her initiative.  (Id.)
However, Plaintiff did not volunteer to and did not reorganize the
drawers herself.  (Def. Resp. to Pl. 56.1 ¶ 10.; see also dkt. no.
47-29.)  Again, this mere suggestion that was not acted upon is
insufficient to raise an issue of fact as to Plaintiff's
qualifications.

Because Plaintiff fails to establish part of the second prong
for a prima facie case under Title VII, the Court need not go
further.  Thus, Plaintiff's motion for summary judgment on this
issue is DENIED, and Defendants' motion for summary judgment on
this issue is GRANTED.

### b) Failure to Promote under NYSHRL and NYCHRL

Under NYSHRL and NYCHRL, Plaintiff need only show that she
was treated "less well than other similarly situated employees, at
least in part for discriminatory reasons." Xiang, 2022 WL 785055,
at *18.  Plaintiff does not proffer any comparable employee for
the Senior PSR position.  Plaintiff does mention several employees
who were either interviewed for or selected for the Shift

Supervisor position.  (See supra Section I.G.)  However, Plaintiff
fails to offer evidence to suggest that she was more qualified or
even as qualified as they or that their performance did not merit
their interview or promotion.  Sosa v. N.Y. Div. of Hum. Rts., No.
11 Civ. 5155 (NGG) (VVP), 2015 WL 5191205, at *8 (E.D.N.Y. Sept.
4, 2015).  Even if Plaintiff could establish that she was treated
less well than similarly situated employees, she does not establish
that it was due to her pregnancy.  Plaintiff's motion for summary
judgment on this issue under NYCHRL is DENIED, and Defendants'
motion for summary judgment on this issue under NYCHRL is GRANTED.

### 3. Disparate Treatment[18]

#### a) Disparate Treatment under Title VII

Under Title VII, "where a plaintiff seeks to establish the
minimal prima facie case by making reference to the disparate
treatment of other employees, those employees must have a situation
sufficiently similar to plaintiff's to support at least a minimal
inference that the difference of treatment may be attributable to
discrimination." McGuinness v. Lincoln Hall, 263 F.3d 49, 54 (2d
Cir. 2001); see also Cutler v. Stop & Shop Supermarket Co., 513 F.
App'x 81, 83 (2d Cir. 2013); Ruiz v. Cnty. of Rockland, 609 F.3d

---

[18] Because the Court discusses the employees that Plaintiff
compares herself to in terms of her accommodation requests and
potential promotion in prior sections, supra Sections III.A.1.a.
and III.A.2., the Court does not do so again here.

486, 493 (2d Cir. 2010).  The comparator does not need to be "identical" to Plaintiff or "engage in the exact same offense" but "must be similarly situated . . . in all material respects." Abdul-Hakeem v. Parkinson, 523 F. App'x 19, 21 (2d Cir. 2013); Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000) (A requirement that employees "engage in the exact same offense" in order to find them similarly situated is unwise because it would produce "a scenario where evidence of favorable treatment of an employee who has committed a different but more serious, perhaps even criminal offense, could never be relevant to prove discrimination.").  "An employee is similarly situated to co-employees if they were (1) subject to the same performance evaluation and discipline standards and (2) engaged in comparable conduct." Abdul-Hakeem, 523 F. App'x at 21.

Regarding performance, Plaintiff claims that Cato was "late all the time." (Pl. Aff. at 3.)  Plaintiff stated that she was "never reprimanded for being late" prior to disclosing her pregnancy or requesting pregnancy-related accommodations, but then on May 24, 2022, Mariscal informed Plaintiff of her time and attendance infractions, which included being late on May 23 by 7 minutes and May 24 by 9 minutes. (Pl. Aff. at 2-3; dkt. no. 47-15 at 14.)  Given the sparsity of the record on this point,

48

Plaintiff has not demonstrated that she is similarly situated to Cato.

Additionally, Plaintiff claims that Bowne, who was listed higher on the staff rankings list than Plaintiff, had nonreliability, time, and attendance issues. (Def. Resp. to Pl. 56.1 ¶ 157.) Defendants argue that there is no suggestion that these ranks were communicated to Plaintiff or Browne, that the negligible difference in ranking had any effect on their employment, or that either was treated differently from the other at any point. The Court agrees.

In addition, Plaintiff claims that she requested a new uniform prior to June 2022, and starting in June 2022, when she was visibly pregnant, Defendants should have known that she could not wear a proper uniform.[19] (Def. Resp. to Pl. 56.1 ¶¶ 71, 73.) Plaintiff asserts that despite this, Defendants reprimanded and ultimately terminated her for not wearing a proper uniform. Defendants, on the other hand, claim Plaintiff first made the uniform request on June 27, 2022, and Defendants ordered her a maternity uniform that same day. (Chaudhry Decl. at 2.) Neither party submitted as evidence an email summarizing this alleged meeting on June 27, which appears to the Court to be management's practice after

---

[19] On several occasions, Plaintiff comfortably wore a Company-branded fleece on top of her shirt, so Defendants likely did not know on their own that there was an issue. (Def. Resp. to Pl. 56.1 ¶ 81.)

speaking with employees about various employment-related topics. However, there is an email summary of a separate conversation with Plaintiff on June 28, 2022, which also includes a recommendation for her termination, that states, Chaudhry "reminded her that upon her first-time communication with management yesterday [June 27, 2022] regarding this, [she] had ordered her maternity scrubs and they should be arriving soon." (Dkt. no. 47-7 at 7-8.)  Defendants also allege that failure to wear a proper uniform did not play a role in their decision to recommend terminating her employment. (Def. Resp. to Pl. 56.1 ¶¶ 80, 82.)  While Plaintiff's managers included her failure to wear a uniform in their email request to terminate Plaintiff, it was not a part of Human Resources' final version of the "Confidential Termination Recommendation" document. (Dkt. no. 47-7 at 7-8; dkt. no. 47-16 at 5, 11.)  Plaintiff alleges that the described treatment was different from how Melo was treated. According to Plaintiff's papers, Melo was not reprimanded or terminated for wearing leggings; however, Plaintiff testified that Melo told her that Mariscal did in fact speak with her regarding her uniform. (Dkt. no. 47-9, 414:22-415:12; Def. Resp. to Pl. 56.1 ¶ 156; Mariscal Decl. at 5.)  Further, on June 10, there was a meeting with all PSRs about, inter alia, uniform and appearance. (Dkt. no. 47-26 at 5.)  Thus, Plaintiff was not being singled out as the only one that was being required to conform to the uniform

policy.    Regardless  of  whether  Melo  wore  leggings  and/or  was
reprimanded  for  it,  Plaintiff  has  not  demonstrated  that  Melo  is
similarly  situated  to  Plaintiff  in  all  material  respects.

Regarding  disciplinary  actions,  Cato  did  not  receive  any
discipline  for  allegedly  clocking  Plaintiff  out  on  June  27,  2022.
(Def.  Resp.  to  Pl.  56.1  ¶  167.)    At  the  time,  Mariscal  said  they
would  investigate  the  situation,  but  later  Defendants  claim  that
Mariscal  and  Chaudhry  did  not  feel  it  was  appropriate  to  assume  or
accuse  Cato  of  wrongdoing  without  evidence.  (Id.  ¶  169.)    Instead,
Defendants  claim  they  did  not  know  it  was  Cato  who  clocked
Plaintiff  out  on  June  27  until  Plaintiff's  deposition.    (Id.
¶  167.)    While  Defendants  could  have  taken  investigatory  steps  to
determine  which  coworker  clocked  Plaintiff  out,[20]  Plaintiff's
conduct  is  significantly  more  serious  than  the  culprit  she  asked
to  be  her  accomplice.    Plaintiff  is  the  one  who  left  early  without
informing  management  and  then  needed  someone  to  clock  her  out.

In  addition,  Carcamo  was  spoken  to  in  June  2021  about  time
card  fraud  because  on  multiple  occasions  he  clocked  into  work  from
his  phone  before  he  even  entered  the  building.    (Def.  Resp.  to  Pl.
56.1  ¶¶  160,  162.)    On  one  occasion,  Carcamo  clocked  in
approximately  three  hours  early  because  he  had  trouble  finding  a

---

[20] Mariscal  testified  that  he  only  reviewed  camera  footage  when
there  was  a  potential  serious  violation  of  policy.    (Def.  Resp.
to  Pl.  56.1  ¶  79;  dkt.  no.  47-12  at  53:1-16.)    He  did  so  to
review  Carcamo's  conduct  and  Plaintiff's  conduct.

parking spot.  (Dkt. no. 47-17 at 3, 7.)  Defendants contend that when Carcamo was first spoken to he volunteered the information and that he was also a stronger performer than Plaintiff.  (Def. Resp. to Pl. 56.1 ¶¶ 160, 162.)  He was issued a final written warning.  (Dkt. no. 47-17 at 4-5.)  Additionally, in September 2022, Carcamo was late to work by 50 minutes and was issued a written warning.  (Dkt. no. 47-17 at 9-14.)  While the Court views the conduct as sufficiently similar - arriving late to work by three hours and clocking in early on a phone compared to leaving early from work by one hour and asking a coworker to clock out - Plaintiff did not provide evidence that Carcamo was similarly situated in all material respects, especially considering that Defendants assert he was a stronger performer.

Hourizadeh was promoted to Shift Supervisor in or around March 2022.  (Def. Resp. to Pl. 56.1 ¶ 128; dkt. no. 47-8 at 10.)  And, Torres, who had less seniority than Plaintiff within the Company, was promoted to Shift Supervisor after July 2022.  (Def. Resp. to Pl. 56.1 ¶¶ 129-30.)  As of June 2022, the goal for Torres was to promote her to Senior PSR by Q4 2022 or Q1 2023.  (Def. Resp. to Pl. 56.1 ¶ 131.)  Plaintiff does not sufficiently allege that Hourizadeh or Torres are similarly situated.  Less seniority does not by itself mean less qualified.

For the foregoing reasons, Plaintiff has not established that Defendants treated a similarly situated employee differently from

Plaintiff. Thus, Plaintiff's motion for summary judgment regarding disparate treatment under Title VII is DENIED, and Defendants' motion for summary judgment on this issue is GRANTED.

### b) Disparate Treatment under NYSHRL and NYCHRL

Under NYSHRL and NYCHRL, Plaintiff need only show that she was treated "less well than other similarly situated employees, at least in part for discriminatory reasons." Xiang, 2022 WL 785055, at *18. For the same reasons stated for Plaintiff's Title VII disparate treatment claim, see supra Section III.A.3.a., Plaintiff's disparate treatment claim also fails under the broader standard of NYSHRL and NYCHRL. Rivera v. PLS Check Cashers of N.Y., Inc., No. 22 Civ. 5642 (AS), 2024 WL 263218, at *7 (S.D.N.Y. Jan. 24, 2024) (granting summary judgment to employer on pregnancy discrimination claims under the NYCHRL because Plaintiff "cannot show that she was treated 'less well' than any other employee"). Thus, Plaintiff's motion for summary judgment regarding disparate treatment under NYSHRL and NYCHRL is DENIED, and Defendants' motion for summary judgment on this issue is GRANTED.

### 4. Wrongful Termination

#### a) Wrongful Termination under Title VII

Plaintiff attempts to show wrongful termination by pointing to the "Potential Liability" section of the "Confidential Termination Recommendation" document as direct evidence that pregnancy was a motivating factor for the termination simply

because it was listed there.    (Pl. Br. at 19-21.)    The Court is unpersuaded by Plaintiff's direct evidence because the Company is allowed to undertake careful review of the risks associated with a termination without that analysis being held against it. Defendants state that "[n]otwithstanding its understanding of the risk, CityMD concluded that Plaintiff's conduct was egregious enough to warrant her termination."    (Def. Resp. to Pl. 56.1 ¶ 190.)

The Court evaluates whether Plaintiff established a prima facie case of wrongful termination by showing that (1) she is a member of a protected class; (2) she was qualified for the position she held and was satisfactorily performing the duties required; (3) she was discharged; and (4) either her position remained open and was ultimately filled by a non-pregnant employee or the discharge occurred in circumstances giving rise to an inference of unlawful discrimination. Xiang, 2022 WL 785055, at *12; Romero v. St. Vincent's Servs., No. 19 Civ. 7282 (KAM) (ST), 2022 WL 2079648, at *4 (E.D.N.Y. June 10, 2022).

There is no dispute that Plaintiff is a member of a protected class because she was pregnant.    Regarding prong two, Plaintiff possessed the basic skills necessary for performance of the job and was satisfactorily doing so.    Although Plaintiff engaged in misconduct throughout her employment, the Court does not find that any of the misconduct was of the kind or seriousness that precludes

Plaintiff from establishing she had the minimal qualifications to perform her job given the misconduct mainly concerned time, attendance, and uniform. Ruiz, 609 F.3d at 492 ("It is at least theoretically possible that an employee committed some misconduct and yet, in the aggregate, performed satisfactorily."). Regarding prong three, Plaintiff was terminated on July 5, 2022. (Dkt. no. 47-16 at 6, 8; see also dkt. no. 50-6 at 2.)

Regarding prong four, a showing of disparate treatment is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case. Abdul-Hakeem, 523 F. App'x at 20-21. Plaintiff claims that her discharge occurred in circumstances giving rise to an inference of unlawful discrimination for many reasons. Plaintiff points to the disparate treatment of other employees, which the Court rejected above, see supra Section III.A.3. Plaintiff also alleges an inference of discrimination by looking at the following facts: she went from "meeting expectations" on April 18, 2022 to being described as one of the "lowest performers" on June 10, 2022; she was reprimanded for being late; she was not promoted; she was reprimanded for not wearing a proper uniform; and she was terminated for something others did and then received a warning and subsequent double promotion. (See supra Section I.)

Further, Plaintiff alleges that she felt like a "burden" and in light of that, stopped including Chaudhry on her accommodation

requests.    (Dkt. no. 47-20 at 2; dkt. no. 47-20 at 4.)    However, Plaintiff's "mere subjective belief that [s]he was discriminated against is insufficient to sustain a claim of [] discrimination." Ostrowski v. Port Auth. of N.Y. & N.J., No.  21 Civ. 3328 (NRM) (LB), 2023 WL 4975960, at *15 (E.D.N.Y. Aug. 3, 2023), aff'd sub nom. Ostrowski v. Port Auth. of N.Y. & N.J., No. 23-1116, 2024 WL 3219310 (2d Cir. June 28, 2024) (internal quotations and citations omitted).

Defendants  argue  that  Plaintiff  relies  solely  on  the  fact that  she  was  pregnant  to  show  an  inference  of  discrimination  but cannot    demonstrate    any    "plausible    connection"    between    her pregnancy  and  the  alleged  treatment.    Chen v. Stony Brook Univ. Advancement, No. 20-4250, 2022 WL 289317, at *2-3 (2d Cir. Feb. 1, 2022).    Defendants  further  contend  that  there  is  nothing  to  suggest that  Plaintiff's  pregnancy  contributed  to  Defendants'  decision  to direct  any  employment  actions,  adverse  or  not,  against  Plaintiff. Blue v. City of Hartford, No. 18-CV-00974 (CSH), 2019 WL 612217, at   *6   (D.   Conn.   Feb.   13,   2019),   adhered   to   in   part   on reconsideration, No. 18-CV-00974 (CSH), 2019 WL 1559430 (D. Conn. Apr. 10, 2019).

While  Defendants  are  correct  that  the  fact  that  Plaintiff  was pregnant  when  she  was  terminated  does  not  alone  give  rise  to  an inference  of  discrimination,  the  Court  must  consider  all  of  the facts  together  and  in  sequence.    Littlejohn v. City of N.Y., 795

F.3d 297, 312 (2d Cir. 2015) ("An inference of discrimination can arise from circumstances including, but not limited to, . . . the sequence of events leading to the plaintiff's discharge.") (internal quotations and citations omitted).  The only significant change that was reported to happen between April 18, 2022, when Plaintiff was "meeting expectations," and June 10, 2022, when Plaintiff was described as one of the "lowest performers," is that Plaintiff requested an accommodation for pregnancy-related reasons.  While it may be true that Plaintiff's behavior shifted in the two-month period, it appears to the Court that the Company kept extensive records when management had conversations with employees and Mariscal himself promised, in connection with a potential promotion in 2022, to continue to have touch bases with Plaintiff to "gauge [her] performance as the year goes on and provide any feedback in real-time."  (Dkt. no. 47-31 at 4.)  However, even when Plaintiff was characterized as one of the "lowest performers," Mariscal and Chaudhry did not discuss termination but rather ways of improving and holding those employees accountable.  (Dkt. no. 47-15 at 17-18.)  Plaintiff's performance evaluations were not the only thing that changed after Plaintiff requested a pregnancy-related accommodation.  She was reprimanded for being late, though she was never spoken to or written up about time and attendance prior to her pregnancy; she was not promoted, though promotion was discussed prior to her

pregnancy; and, she was reprimanded for not wearing a proper uniform. On the other hand, Plaintiff does not allege that she was ever late before she requested a pregnancy-related accommodation, so her own behavior could have been the reason for the change.

Taking all of the facts together, reasonable minds can differ as to whether Plaintiff's discharge occurred in circumstances giving rise to an inference of unlawful discrimination. Thus, Plaintiff's motion for summary judgment regarding her wrongful termination claim under Title VII is DENIED, and Defendants' motion for summary judgment on this issue is DENIED.

### b) Wrongful Termination under NYSHRL and NYCHRL

Under NYSHRL and NYCHRL, while Plaintiff cannot establish that she was treated "less well" than a specific "similarly situated employee," there is a genuine dispute as to whether the general sequence of events, as articulated above, see supra Section III.A.4.a., creates an inference that Plaintiff was terminated "at least in part for discriminatory reasons." Xiang, 2022 WL 785055, at *18; Littlejohn, 795 F.3d at 312. Accordingly, Plaintiff's motion for summary judgment regarding her wrongful termination claim under NYSHRL and NYCHRL is DENIED, and Defendants' motion for summary judgment on this issue is DENIED.

**B.    Retaliation under Title VII, NYSHRL and NYCHRL**

**1. Plaintiff's Prima Facie Case**

To establish a prima facie case of retaliation under Title VII, Plaintiff must establish (1) participation in a protected activity; (2) that Defendants knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.  Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010).

To demonstrate that Plaintiff participated in a protected activity, the burden is on her to clarify to Defendants that she is complaining of unfair treatment due to her membership in a protected class as opposed to just complaining merely of unfair treatment generally.  Washington v. N.Y.C. Dep't of Educ., 740 F. App'x 730, 733-34 (2d Cir. 2018) ("Complaints about working conditions are protected activities.  However, such complaints must specifically relate to conduct prohibited by statute."); Risco v. McHugh, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012) ("[I]nformal complaints must be sufficiently specific to make it clear that the employee is complaining about conduct prohibited by Title VII.").  Plaintiff alleges that her protected activities include: (1) her accommodation request; and (2) her complaints that the clinic was "understaffed," it was "exhausting," and she felt like Chaudhry was "dismissive."  (Pl. Reply Br. at 22.) Plaintiff's accommodation requests are recognized as protected

59

activities, and Defendants knew the requests were related to her pregnancy, more specifically, her need to attend prenatal appointments; in contrast, her other informal complaints are not. Plaintiff never intimated that her opinion about the workplace, such as complaining it was "understaffed" and "exhausting," had anything to do with her pregnancy.  In fact, based on her conversation with Mariscal on May 24, it appeared Plaintiff was just generally frustrated by management when Mariscal was out of the office. (Dkt. no. 47-15 at 13.) Rojas v. Roman Cath. Diocese of Rochester, 660 F.3d 98, 108 (2d Cir. 2011) ("The competent evidence in the record showed that any complaints [Plaintiff] made were generalized" and therefore could not reasonably have been understood that she was complaining of conduct prohibited by Title VII.); Johnson v. City Univ. of N.Y., 48 F. Supp. 3d 572, 577 (S.D.N.Y. 2014) ("It is objectively unreasonable to believe that complaining about poor treatment in the workplace entirely unrelated to any trait, protected or otherwise, is a 'protected activity' under Title VII.").

To continue, an adverse employment action means "that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006).  Plaintiff was terminated, which unquestionably qualifies as an adverse employment action.  See,

e.g., Feingold v. N.Y., 366 F.3d 138, 152 (2d Cir. 2004).
Plaintiff claims that the following also classify as adverse
employment actions: being reprimanded for lateness and wearing an
improper uniform as well as being rated as the lowest performing
employee. (Pl. Br. at 22.) Plaintiff is incorrect. "Criticism,
verbal reprimands, and notices of potential discipline, by
themselves, do not qualify as adverse employment actions." Stewart
v. City of N.Y., No. 22-2775, 2023 WL 6970127, at *2 (2d Cir. Oct.
23, 2023).

A causal connection can be established indirectly by showing
that the protected activity was closely followed in time by the
adverse action. Rivera v. JP Morgan Chase, 815 F. App'x 603, 608
(2d Cir. 2020) ("Close temporal proximity between the plaintiff's
protected action and the employer's adverse employment action may
in itself be sufficient to establish the requisite causal
connection between a protected activity and retaliatory action.")
(collecting cases); see also Littlejohn, 795 F.3d at 319 (quoting
Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)).
To be close in time, the adverse activity generally must have
occurred within a few months of the protected activity. Abrams v.
Dep't of Pub. Safety, 764 F.3d 244, 254 (2d Cir. 2014) (finding a
gap of five months "might be enough to establish a prima facie
case" of retaliation); Summa v. Hofstra Univ., 708 F.3d 115, 128
(2d Cir. 2013) (a gap of seven months between a protected activity

61

and an alleged retaliatory act can be "sufficient to raise an inference of causation"); Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty., 252 F.3d 545, 555 (2d Cir. 2001) (finding gap of four months sufficient for a prima facie case of retaliation); De Figueroa v. New York, 403 F. Supp. 3d 133, 157 (E.D.N.Y. 2019) ("There is no firm outer limit to the temporal proximity required, but most courts in the Second Circuit have held that a lapse of time beyond two or three months will break the causal inference."). Here, there is temporal proximity between the protected activity and the adverse employment action. Plaintiff initially requested an accommodation at the end of May 2022 and was terminated on July 5, 2022. (Dkt. no. 47-9 at 195:8-13; dkt. no. 50-6 at 2.)

Accordingly, Plaintiff established a prima case of retaliation under Title VII. And, given the similarities of the standards, Plaintiff established a prima case of retaliation under NYSHRL and NYCHRL, for the same reasons. Under Title VII, NYSHRL and NYCHRL, the Court must now engage in the McDonnell Douglas burden-shifting analysis. McHenry, 510 F. Supp. 3d at 66-67; Cardwell v. Davis Polk & Wardwell LLP, No. 19 Civ. 10256 (GHW), 2023 WL 2049800, at *25 (S.D.N.Y. Feb. 16, 2023).

### 2. Employer's Legitimate, Non-Discriminatory Reason

Where Plaintiff makes out a prima facie case, the burden shifts to Defendants to articulate a "legitimate,

nondiscriminatory reasons" for the employment action.  McDonnell Douglas, 411 U.S. at 802.  Defendants allege that Plaintiff was terminated because of her misconduct and violations of Company policy on June 27 and 28, 2022.  (Def. Br. at 13-17; see supra Section I.F.)

Plaintiff attempts to offer valid reasons for her leaving early on June 27.  One explanation is that "it was common practice for employees to leave to catch the midnight bus to New Jersey to be able to make it on time before the morning shift in New York." (Pl. Aff. at 5; Def. Resp. to Pl. 56.1 ¶¶ 194, 200.)  However, Plaintiff testified that she did not need to leave work early on every occasion in which she worked until midnight.  (Def. Resp. to Pl. 56.1 ¶ 200.)  Additionally, it is incomprehensible that a Company would allow a "common practice" of employees leaving their shift early.  Another explanation is that Plaintiff received permission from Mariscal.[21]  (Def. Resp. to Pl. 56.1 ¶ 198.)  Yet, Mariscal was not working the evening shift that night and would not know how busy the site would be at that time.  (Dkt. no. 47-9, 218:10-13, 219:19-220:23.)  The only rational finding here is that Plaintiff did not have permission.  If she had, she certainly would have reminded management of that when they spoke to her the

---

[21] Plaintiff also gave conflicting testimony about why she did not ask Chaudhry, who was working that night.  (Dkt. no. 47-9, 221:19-222:2.)

next day about wrongfully leaving.  At the very least, she would have mentioned it in her termination meeting but instead she said, "why couldn't y'all just give me a write up?"  (Dkt. no. 50-8 at 2.)  Though Plaintiff believes the Company should have given her a written warning instead of terminating her employment, Plaintiff does not deny that she violated Company policies or even that she should have been disciplined.  (Dkt. no. 47-9 at 230:7-17, 351:12-352:7.)   "Violation of company policy is a legitimate, nondiscriminatory reason for an employer to terminate the employment of an employee."  Bourara v. N.Y. Hotel Trades Council & Hotel Ass'n of N.Y.C., Inc. Emp. Benefit Funds, No. 17 Civ. 7895 (DF), 2020 WL 5209779, at *10 (S.D.N.Y. Sept. 1, 2020), aff'd, No. 20-3092, 2021 WL 4851384 (2d Cir. Oct. 19, 2021).   And, the Company's policies explicitly state that there is no "formal progressive discipline policy requiring a set number of warnings or counseling sessions.  Instead, each case is considered based on its own facts.  In the case of misconduct or violation of the Company's policies, immediate termination may, in the sole discretion of the Company, be deemed appropriate or necessary."  (Dkt. no. 47-32 at 6.)  See Brown v. Pension Bds., 488 F. Supp. 2d 395, 406 (S.D.N.Y. 2007) ("Certainly, an employer is entitled to discharge an employee who fails to follow company rules and fails to appear for work without notification . . . ").  Thus, Defendant

sufficiently articulated a legitimate, nondiscriminatory reason for terminating Plaintiff.

### 3. Plaintiff Must Prove Pretext

After Defendants proffer a nondiscriminatory reason, the presumption of discrimination arising with the prima facie case "drops from the picture," and the final burden returns to Plaintiff to demonstrate that Defendants' reason is in fact a pretext for unlawful discrimination. Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).

Under Title VII, Plaintiff must show that retaliatory intent was the "but-for" cause of any wrongful actions — that is, "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Tex. S.W. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013); Russell v. N.Y. Univ., 739 F. App'x 28, 32 (2d Cir. 2018) (noting that to be actionable, the retaliation must have been the "but-for cause of the adverse action, and not simply a substantial or motivating factor.") (internal quotations and citations omitted). "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such discrepancies, a reasonable juror could conclude

that the explanations were a pretext for a prohibited reason." Zann Kwan, 737 F.3d at 846.

The causation standard is lower under NYCHRL, and likely NYSHRL, see supra Section II.C. n. 11, whereby summary judgment in favor of Defendants is inappropriate if a reasonable jury could conclude that Defendants' "stated reasons were not its sole basis for taking action, and that its conduct was based at least in part on discrimination [or retaliation]." Ya-Chen Chen v. City Univ. of New York, 805 F.3d 59, 76 (2d Cir. 2015) (internal quotations and citations omitted). In other words, unlike Title VII, the NYCHRL uses a "mixed-motive" standard whereby pretext is demonstrated if Plaintiff can show that retaliation played any role in the Defendants' alleged adverse actions. Id.; Cardwell, 2023 WL 2049800, at *35.

Plaintiff alleges Defendants' stated reason for Plaintiff's termination is in fact a pretext for unlawful discrimination because she was treated differently from Cato and Carcamo. However, as articulated above, her claim of disparate treatment is unsupported. (See supra Section III.A.3.a.) Graham, 230 F.3d at 43 ("Were a jury to find on these facts that there was disparate treatment in [defendant's] disciplining of plaintiff when compared to similarly situated employees, it could also find that [defendant's] proffer of a non-discriminatory reason for [plaintiff's] dismissal was pretextual."); Greenway v. Buffalo

66

Hilton Hotel, 143 F.3d 47, 51 (2d Cir. 1998) (inconsistent application of company disciplinary policy was sufficient for jury to find that employer's defense was pretext for discrimination). Additionally, the Court notes that "while [Plaintiff] may disagree that termination was warranted in this circumstance, her disagreement as to the severity of her violation is insufficient to show discrimination or pretext." Bramble v. Moody's Corp., No. 23-506, 2024 WL 705955, at *2 (2d Cir. Feb. 21, 2024).

Plaintiff also alleges pretext using the same evidence she alleges to prove she was discharged under circumstances giving rise to an inference of discrimination for her wrongful termination claim. (See supra Section III.A.4.a.) In addition to that evidence, Plaintiff points to the lack of consistency among Defendants' employees about the official reason for Plaintiff's termination as evidence that it was pretextual.

Chaudhry testified that she recommended Plaintiff's termination for certain reasons, but she did not know exactly "what ultimately [became] the reason for termination." (Def. Resp. to Pl. 56.1 ¶ 181.) While it may seem abnormal for a manager not to know why an employee was terminated, an alternative explanation could be that Human Resources considers what the managers recommend but ultimately reviews the circumstances and the "Confidential Termination Recommendation" document to ensure the employee is being terminated for legitimate reasons set forth in the Company's

policies.  Therefore, the fact that Chaudhry did not know the final reason for Plaintiff's termination is not sufficient to prove Defendants' stated reason was pretextual.

Furthermore, the original email requesting Plaintiff's termination includes leaving early on June 28 and failure to wear a proper uniform as reasons for termination, but they were not included in any version of the "Confidential Termination Recommendation" document.  (Dkt. no. 47-7 at 7-8; dkt. no. 47-16 at 9-20.)  Defendants allege that failure to wear a proper uniform did not play a role in their decision to recommend terminating her employment.  (Def. Resp. to Pl. 56.1 ¶¶ 80, 82.)  Specifically, Martinez testified that he did not include Plaintiff's failure to wear her CityMD uniform in the "Confidential Termination Recommendation" because her employment was not terminated for that reason.  (Def. Resp. to Pl. 56.1 ¶¶ 182, 187.)

Furthermore, Martinez testified that the "Confidential Termination Recommendation" document includes a "snapshot of the entirety of the team member's performance and behavior throughout . . . their [sic] tenure," based on records of conversations reviewed but that the termination of the employee's employment is not based on everything that is listed in the document.  (Dkt. no. 47-11, 127:11-18; Def. Resp. to Pl. 56.1 ¶ 187.)  Plaintiff's time and attendance infractions are listed on the document but, consistent with Martinez's testimony, Defendants deny that

68

Plaintiff was terminated for time and attendance. (Dkt. no. 47-16 at 9-20; Def. Resp. to Pl. 56.1 ¶ 163.) According to Salazar's declaration, "[t]he 'Overall Reason for Term' category on the Termination Recommendation form lists only one reason for termination, and is not designed to capture all of the reasons for an employee's discharge." (Salazar Decl. at 2; Def. Resp. to Pl. 56.1 ¶ 189.) Plaintiff's "Overall Reason for Term" was "Time Card Fraud." (Dkt. no. 47-16 at 9-20.) Oddly though, Defendants changed the language that would be read to Plaintiff, listed under the "Recommended Termination Verbiage" section, from "falsifying [her] time card" to "abandoning [her] shift." (Dkt. no. 47-16 at 9-20.) According to Defendants, the "Recommended Termination Verbiage" is only the recommended language for management to use when informing the employee of her discharge and is not meant to capture all of the reasons for the termination. (Def. Resp. to Pl. 56.1 ¶ 188.)

The evidence presented does not clearly point to one reason for Plaintiff's termination but rather multiple conflicting ones. Sohnen v. Charter Commc'ns, Inc., No. 18 Civ. 6744 (LDH) (RLM), 2022 WL 900602, at *11 (E.D.N.Y. Mar. 28, 2022) (finding that inconsistencies in the defendant's justifications for terminating the plaintiff were sufficient to raise a genuine issue of fact as to pretext). Courts have found that temporal proximity, which is established here between Plaintiff's accommodation request and

Plaintiff's termination, and inconsistent explanations for Plaintiff's termination are sufficient to raise a triable issue of fact as to pretext. <u>Zann Kwan</u>, 737 F.3d at 847 (finding close temporal proximity and inconsistent explanation for termination sufficient to raise a triable issue of fact as to pretext); <u>see also</u> <u>Espinal v. Goord</u>, 558 F.3d 119, 129 (2d Cir. 2009) (holding that the court may "exercise its judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases"); <u>Fasanello v. U.N. Int'l Sch.</u>, No. 19 Civ. 5281, 2022 WL 861555 (GHW), at *13 (S.D.N.Y. Mar. 23, 2022) ("Plaintiff has put forth sufficient evidence to call into question [the defendant's] proffered explanation for his termination.").

Additionally, the evidence set forth for the wrongful termination claim, <u>see</u> <u>supra</u> Section III.A.4.a., also raises questions for the jury in the context of pretext, as Defendants could have started to create a record of conduct—including, but not limited to, time, attendance, and uniform infractions—that could allow legal reasons for Plaintiff's termination in the future when the real motive was because Plaintiff was pregnant and/or requested an accommodation.

Thus, there are questions of fact regarding whether Defendants' given reason for termination is pretextual that can only be resolved by a jury. Therefore, Plaintiff's motion for summary judgment regarding her retaliation claim under Title VII

is DENIED, and Defendants' motion for summary judgment on this issue is DENIED.  For the same reasons, Plaintiff's motion for summary judgment regarding her retaliation claims under NYSHRL and NYCHRL is DENIED, and Defendants' motion for summary judgment on this issue is DENIED.

## IV.  **Conclusion**

For the reasons set forth above, Plaintiff's motion for summary judgment is DENIED, and Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

Specifically, regarding Count 1, which alleges discrimination in violation of Title VII, Defendants' motion for summary judgment is GRANTED, and Plaintiff's motion for summary judgment is DENIED on Plaintiff's discrimination claims that are based on failure to accommodate, failure to promote, and disparate treatment under Title VII.  Both Defendants' motion for summary judgment and Plaintiff's motion for summary judgment are DENIED on Plaintiff's discrimination claims relating to wrongful termination under Title VII.

Count 2 alleges retaliation in violation of Title VII.  Both Defendants' motion for summary judgment and Plaintiff's motion for summary judgment are DENIED on Plaintiff's retaliation claims under Title VII.

Count 3 alleges discrimination in violation of NYSHRL. Defendants' motion for summary judgment is GRANTED, and

Plaintiff's motion for summary judgment is DENIED on Plaintiff's discrimination claims that are based on failure to accommodate, failure to promote, and disparate treatment under NYSHRL.    Both Defendants' motion for summary judgment and Plaintiff's motion for summary judgment are DENIED on Plaintiff's discrimination claims relating to wrongful termination under NYSHRL.

Count 4 alleges retaliation in violation of NYSHRL.    Both Defendants' motion for summary judgment and Plaintiff's motion for summary judgment are DENIED on Plaintiff's retaliation claims under NYSHRL.

Count 5 alleges discrimination in violation of NYCHRL. Defendants' motion for summary judgment is GRANTED, and Plaintiff's motion for summary judgment is DENIED on Plaintiff's discrimination claims that are based on failure to accommodate, failure to engage in cooperative dialogue, failure to promote, and disparate treatment under NYCHRL.    Both Defendants' motion for summary judgment and Plaintiff's motion for summary judgment are DENIED on Plaintiff's discrimination claims relating to wrongful termination under NYCHRL.

Count 6 alleges retaliation in violation of NYCHRL.    Both Defendants' motion for summary judgment and Plaintiff's motion for summary judgment are DENIED on Plaintiff's retaliation claims under NYCHRL.

The Clerk of the Court shall close the open motions at dkt. nos. 47 and 48.  Counsel shall confer and inform the Court by letter no later than February 17, 2025, how they propose to proceed.

**SO ORDERED.**

Dated:      February 4, 2025
            New York, New York

_____
LORETTA A. PRESKA
Senior United States District Judge